# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01263-COA

**ROY L. JONES A/K/A ROY LEE JONES**                         **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                     **APPELLEE**

DATE OF JUDGMENT:            10/04/2021
TRIAL JUDGE:                 HON. TOMIKA HARRIS IRVING
COURT FROM WHICH APPEALED:   CLAIBORNE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     ALISON O'NEAL McMINN
                             CATHERINE LEIGH PETTIS
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:           DANIELLA M. SHORTER
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 01/17/2023
MOTION FOR REHEARING FILED:

### BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.

### SMITH, J., FOR THE COURT:

¶1.     A Claiborne County Circuit Court jury convicted Roy Jones of capital murder for the homicide of Rosetta Ellis during the commission of a robbery. The Claiborne County Circuit Court sentenced Jones as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. On appeal from his conviction and sentence, Jones raises the following arguments: (1) the circuit court erroneously denied his motion for a mistrial; (2) insufficient evidence supported the underlying felony of robbery for his capital-murder conviction; (3) his conviction was against the overwhelming weight of the evidence; and (4) his trial attorney rendered ineffective

assistance of counsel. Finding no error, we affirm Jones's conviction and sentence.

**FACTS**

¶2. Bobby Claiborne worked as a deputy for the Claiborne County Sheriff's Department at the time of Ellis's murder. Around noon on June 24, 2018, the sheriff's department received a phone call about a possible fire at Ellis's mobile home located at 1030 William Camphor Drive in Port Gibson, Mississippi. When Deputy Claiborne arrived at the scene around 12:18 p.m., he saw that Keon Brandon from the Claiborne County Fire Department had already arrived and was attempting to extinguish the fire. Deputy Claiborne assisted Brandon for about thirty minutes until the two men successfully got the fire under control. Once the men were able to enter the mobile home, they found Ellis's body in the back bedroom. Ellis was lying face down on her bed with a blanket covering her body. Brandon testified that Ellis's bed had been set on fire, and the men noticed burns to both Ellis's back and legs. When the men turned over Ellis's body, they observed bruises on her face and a considerable amount of blood coming from her nose and mouth. Brandon testified that the back door of the mobile home had been open when he first arrived but that he had seen no signs of forced entry. Brandon further testified that the inside of Ellis's home had appeared "kind of ransacked" with items strewn everywhere.

¶3. J.W. Mallett, the Claiborne County Coroner, provided further testimony about the condition of Ellis's body. Much like Brandon and Deputy Claiborne, Mallett observed "[a] lot of blood" at the crime scene. Mallett stated that Ellis had blood coming from her nose and mouth and appeared to have injuries consistent with some type of head trauma. In

2

addition, although Ellis's body was discovered on a hot day in June, Mallett observed a scarf wrapped around her neck. Once the blanket was removed from around Ellis's body, Mallett also observed a purse underneath her.

¶4.     Kevin Martin, a deputy fire marshal with the Mississippi State Fire Marshal, testified that he investigated fires to determine their causes and origins. During his investigation of the fire at Ellis's residence, Martin discovered three separate areas of origin for the fire: the living room, the master bedroom, and the hallway to a second bedroom. On the living room floor, Martin found paper towels that had been set on fire next to the couch. In the master bedroom, Martin observed that the bedding on the master bed had been set on fire. And on the opposite side of the trailer from the master bedroom, in the hallway leading to a second bedroom, Martin discovered grass clippings that had been used as the third origin point for the fire.

¶5.     After eliminating accidental causes for the fire's origin points, Martin concluded that the fire had been deliberately started. Martin explained that Ellis's kitchen had separated the master bedroom and the living room, which were two areas of origin for the fire. Despite finding that paper towels had been spread across the kitchen floor and that the stove's knobs had been turned to the highest heat setting, Martin testified the stove did not sustain any actual fire damage to indicate that it had been an origin point for the fire. Based on these observations and others made during his investigation, Martin determined that one area of origin had not caused the other two and that each area of origin had resulted from a completely separate and intentional act. Martin also stated his investigation had revealed that

3

the three origin points for the fire were "set relatively close" in time to one another.

¶6.     Ellis's neighbor, Donald Reed, testified that he arrived home around noon on June 24, 2018, and noticed the fire at Ellis's mobile home. Reed stated that he knew Ellis personally and had worked with her for about ten years. Upon discovering that the back door of Ellis's home was unlocked, Reed opened the door and tried to enter the residence. As he attempted to peer into the mobile home through all the smoke, Reed observed clothes strewn across the floor of Ellis's residence. According to Reed, the state of Ellis's home was uncharacteristic because Ellis usually kept her home neat.

¶7.     Another neighbor, Betty Minor, testified that she lived about three houses down from Ellis and had been friends with her. Immediately before observing the fire at Ellis's home on June 24, 2018, Minor was eating a meal inside her own residence. After finishing her meal, Minor went to her front door and looked outside. Minor testified that she saw Jones, whom she identified in court, walking along the pathway outside her home. Referring to Ellis's residence, Jones told Minor "that the lady's house was on fire." Jones then proceeded to his own mobile home, and Minor ran to Ellis's home. Minor testified that at the time Jones told her about the fire, she did not see anyone else in the vicinity until she reached Ellis's home, where she spotted Reed. Minor further testified that Jones was the only person she saw using the pathway on the day of the fire. Minor explained that the pathway Jones was walking on led to an abandoned mobile home that previously had burned down. When asked whether someone could get to Ellis's residence from the pathway, Minor confirmed that access was possible if the person went behind the abandoned mobile home.

4

¶8.     Claude Long, the division director of electronic monitoring and registered sex offenders for MDOC, testified that on the day of Ellis's death his department was monitoring Jones's movements via an electronic ankle monitor.  Director Long explained that an ankle monitor "works similar[ly] to a cell phone GPS" by using satellite and cell towers to provide "real[-]time data of time and day where a person is located, their movement, if they're in a vehicle, how fast they travel, [and] where they're at throughout the day."  Director Long further explained that "every three minutes the GPS will ping a signal and find out the location of the offender" and that the monitoring system for Jones's ankle monitor was accurate to within about "200 feet or less of an area . . . ."

¶9.     The GPS records for Jones's ankle monitor on June 24, 2018, indicated that at 9:13 a.m., Jones was by 1029 William Camphor Drive.  Investigator James Jefferson, who worked for the Claiborne County Sheriff's Department at the time in question, testified that 1029 William Camphor Drive was close to and in the general vicinity of Ellis's home, which was located at 1030 William Camphor Drive.  As Director Long affirmatively testified, Jones remained in the vicinity of 1029 William Camphor Drive until 12:17 p.m.

¶10.    Three days after Ellis's body was discovered, law enforcement officers interviewed Jones about Ellis's murder and the fire at her home.  After the circuit court admitted the recording of Jones's interview into evidence without any objection, the State played the recording for the jury.  Investigator Jefferson testified that he had looked into the statements Jones made during the interview and had learned Jones "was not being truthful about his whereabouts at the time of the fire."  Investigator Jefferson testified that Jones had stated

5

during the interview that around 8:30 a.m. on the day of the fire, he had been going to a particular store when he "turned around and came back across several other alleys and came back in the area to his house" because "he forgot his wallet or something." Investigator Jefferson asked MDOC to check the GPS records from Jones's ankle monitor, and the records indicated that Jones remained in the vicinity of 1029 William Camphor Drive on the morning of the fire at Ellis's home.

¶11. Investigator Jefferson also conducted several interviews, including with Ellis's neighbor Minor, and with a jailhouse informant named David Claiborne, who gave a statement regarding admissions Jones made to him about details of the murder that had never been publicly released. Based on his investigation into Jones's movements prior to the fire and his interviews with Minor and Claiborne, Investigator Jefferson sought a warrant for Jones's arrest. After Jones's arrest, Investigator Jefferson observed that Jones had scratches on his hands, back, and shoulder. As a result, Investigator Jefferson obtained samples of Jones's DNA for comparison to evidence collected from the crime scene.

¶12. Investigator Jefferson testified that he subsequently received the results of the DNA analysis. The report confirmed that DNA evidence collected from inside Ellis's home was consistent with Jones's profile. Investigator Jefferson explained that finding Jones's DNA evidence at the crime scene contradicted Jones's interview claims that "he had not been in [Ellis's] house in a long time" and had only "been in the yard."

¶13. The jury also heard trial testimony from Claiborne, whom Investigator Jefferson had interviewed during his investigation into Ellis's death. Claiborne testified that he had been

Jones's friend for over thirty years. Claiborne readily admitted that he was not a stranger to the deputies in Claiborne County and had been in trouble with law enforcement on more than one occasion. Although he could not recall the exact date, Claiborne testified that around 9 p.m. one evening Jones came over to his house. According to Claiborne, Jones stated "that he got himself in trouble. He had choked someone, hit someone in the head . . . ." Claiborne testified that Jones had refused to give him any additional details about the incident. Claiborne stated that after spending the night at his home, Jones had gotten up the next morning and had left around 6 a.m. After Claiborne testified that Jones had never identified the gender of the person he hit in the head, the State used the transcript of Claiborne's grand jury testimony to refresh his memory. After refreshing his recollection with his prior testimony, Claiborne confirmed that the person Jones had stated he hit in the head was female.

¶14. Claiborne testified that approximately three weeks after the murder, on July 16, 2018, he and Jones were in jail together when Jones admitted he had choked Ellis, hit her in the head, and taken money from her. Claiborne stated that at the time of Jones's admissions, he had observed a mark on Jones's neck. Claiborne testified that while still in custody, he relayed Jones's admissions, as well as his observation of the mark on Jones's neck, to Investigator Jefferson. Following the defense's cross-examination of Claiborne, the State moved on redirect to admit into evidence the video of Claiborne's prior statement to Investigator Jefferson. Over the defense's objection, the circuit court admitted the recording into evidence; the State then played the recording for the jury.

¶15. In the video recording, Claiborne informed Investigator Jefferson that an acquaintance named Levy Dorsey dropped Jones off at Claiborne's home around 10 p.m. on the night of Ellis's murder. Claiborne stated that Jones had admitted to getting into some trouble. When Claiborne asked for further details, Jones had confessed that he hit a woman in the head while she was lying in her bed, strangled her, and took some money from her home. Claiborne stated that he had observed scratches on the left side of Jones's neck and that Jones had some money with him when he arrived at Claiborne's home. Claiborne further stated that Jones had spent the night at his home and then left the following morning. Later that same morning, Claiborne heard about Ellis's murder.

¶16. Dr. Mark LeVaughn next testified as an expert in forensic pathology. Following Ellis's autopsy, Dr. LeVaughn provided a forensic report on the autopsy's results. Dr. LeVaughn testified that Ellis had multiple indications of blunt force trauma to her head, including blood in her hair, scalp lacerations, and a fractured skull. In addition, Ellis sustained thermal burns on her buttocks, legs, and clothing consistent with being burned while lying in her bed. Dr. LeVaughn stated, however, that Ellis's larynx was free of any soot. According to Dr. LeVaughn, the lack of soot in Ellis's larynx indicated either that the fire in her home was not "enough to produce any soot" or "more likely . . . [that] she was dead before the fire started . . . ." As Dr. LeVaughn further testified, the autopsy revealed strangulation as the cause of Ellis's death. Dr. LeVaughn stated that the scarf tied around Ellis's neck had made ligature marks. He also stated that Ellis's larynx showed hemorrhaging due to strangulation.

8

¶17. A forensic serologist screened clippings taken from Ellis's fingernails and the outside of her purse for the possible presence of blood. Both the fingernail clippings and the exterior purse clipping screened positively for the possible presence of blood. To leave sufficient sample sizes of the clippings for DNA testing, the serologist performed no further analysis to absolutely confirm the presence of blood on the clippings.

¶18. A DNA analyst next performed tests on the fingernail clippings taken from Ellis's left hand, the clippings taken from inside her purse, and four DNA swabs collected from Jones. With regard to Ellis's lefthand fingernail clippings, the DNA analyst performed a secondary test known as "Yfiler testing," which specifically tested "for the Y chromosome, male DNA." The DNA analyst stated that the Yfiler testing on Ellis's fingernail clippings "produced a partial profile with results at six loci" that was consistent with Jones's Y profile. As a result, the DNA analyst explained that "Jones and all male individuals within his biological paternal lineage [could not] be excluded as a donor of the male DNA in that profile." The DNA analyst further testified that "test results for the cuttings from inside [Ellis's] purse produced a mixture [of DNA], which [wa]s consistent with the reference samples of the victim and the suspect, Roy Lee Jones." Therefore, the DNA analyst stated that Ellis and Jones could not "be excluded as . . . possible contributor[s] to that sample." Upon further questioning, the DNA analyst reiterated that with regard to the clippings collected from Ellis's lefthand fingernails and inside her purse, Jones "could not be excluded from the [DNA] mixture" tested.

¶19. After the State rested its case-in-chief, the defense moved for a directed verdict.

Following the circuit court's denial of the motion, the defense called Dorsey as its first and only witness. Dorsey testified that he lived "right behind where the fire started" at Ellis's residence and had known both Jones and Claiborne for many years. Dorsey testified that he and Jones often went over to Claiborne's residence, but he denied that he had ever left Jones at Claiborne's home as Claiborne had earlier testified. After Dorsey's testimony, the defense rested.

¶20. The jury found Jones guilty of capital murder with the underlying felony of robbery, and the circuit court sentenced Jones as a habitual offender to life imprisonment in MDOC's custody without eligibility for parole. Jones filed a motion for a new trial, which the circuit court denied as untimely. Aggrieved by his conviction and sentence, Jones appeals.

## DISCUSSION

### I. Motion for a Mistrial

¶21. During voir dire, the State asked whether any of the potential jurors would be unable to return a guilty verdict even if the State met its burden to prove Jones's guilt beyond a reasonable doubt. In response, one potential juror, who was Jones's former sister-in-law, indicated that she would not be able to find Jones guilty. When asked to explain, Jones's former sister-in-law stated, "Like I say, he's been my brother-in-law for many, many years[,] and he ha[s] done wrong in the past, but—." The circuit court immediately halted the response and granted the defense's motion to strike the response. During a bench proceeding outside the jury's hearing, the defense argued the comment about Jones's alleged past wrongdoing had tainted the jury pool. After the circuit court denied the defense's motion for

10

a mistrial, voir dire resumed. On appeal, Jones renews his argument that the comment by his former sister-in-law was prejudicial and tainted the jury pool. He therefore asserts that the circuit court erred by denying his motion for a mistrial.

¶22. We review the circuit court's denial of Jones's mistrial motion for abuse of discretion. *Dorsey v. State*, 310 So. 3d 1238, 1249 (¶36) (Miss. Ct. App. 2021). As we have previously explained,

> a trial judge is best suited to determine the prejudicial effect of an objectionable remark and is given considerable discretion in deciding whether the remark is so prejudicial as to merit a mistrial. Unless serious and irreparable damage results from an improper comment, the judge should admonish the jury then and there to disregard the improper comment.

*Id.* (citations and internal quotation marks omitted).

¶23. In previously addressing a similar situation that arose from a prospective juror's voir dire response, the Mississippi Supreme Court held that the isolated remark failed to warrant a mistrial. *Grayson v. State*, 806 So. 2d 241, 253 (¶32) (Miss. 2001). In *Grayson*, the jurors were asked whether they would be willing to consider mitigating evidence if the State proved the defendant was guilty of capital murder or whether they automatically would be inclined to give the death penalty. *Id.* at (¶30). One potential juror indicated that he would not be willing to consider mitigating evidence under those circumstances. *Id.* In explaining his answer, the potential juror characterized the defendant as "mentally off." *Id.* The circuit court in *Grayson* immediately interrupted the potential juror's response, but "the other jurors were neither questioned about the statement nor admonished to disregard it." *Id.* at (¶¶30-31). The circuit court did, however, later question the prospective jurors about their ability

11

to be fair, and they answered affirmatively. *Id.* at (¶31). On appeal, the supreme court concluded "[t]hat fact, combined with the brief nature of the comment, suggest[ed] that it was not so prejudicial as to warrant a mistrial . . . ." *Id.* at (¶32).

¶24. More recently, this Court reached a similar determination where a trial witness mentioned that the defendant had been previously arrested, and the circuit court sustained the defense's objection but denied its mistrial motion. *Murshid v. State*, 326 So. 3d 489, 499 (¶31) (Miss. Ct. App. 2021). Upon review, we found in *Murshid* that the defense "objected to the remark before [the witness] revealed the nature of the prior charge" and that there was no evidence of substantial or irreparable prejudice due to the single reference about the prior arrest for an undisclosed charge. *Id.* at 500 (¶33). In addition, we noted the following: (1) at the close of the trial, the circuit court properly instructed the jurors to disregard any inadmissible statements that lacked a basis in the evidence, and (2) our caselaw presumes that jurors follow a court's instructions. *Id.*

¶25. Similarly to the proceedings in *Grayson*, the jurors here were not asked whether they could disregard the comment by Jones's former sister-in-law, nor were they admonished to do so. The circuit court did, however, immediately interrupt the response. Thus, as in *Murshid*, Jones's former sister-in-law revealed no details whatsoever about the alleged past wrongdoing, including whether the undisclosed act was even criminal in nature. The circuit court also granted the timely motion by Jones's attorney to strike the comment from the record. And throughout the remainder of voir dire, the prospective jurors were repeatedly questioned about their ability to remain fair and impartial. As also occurred in *Murshid*, the

12

circuit court here properly instructed the jurors at the conclusion of Jones's trial about their duty to consider only admissible testimony and evidence and to disregard any remarks the court had excluded.

¶26. Based upon our review of the record and relevant caselaw, we conclude that the isolated and vague nature of the voir dire comment, when coupled with the actions of the circuit court, did not result in such irreparable harm or prejudice to Jones so as to warrant a mistrial. We therefore find no abuse of discretion in the circuit court's denial of Jones's motion for a mistrial.

## II.      Sufficiency of the Evidence

¶27. Jones asserts there was insufficient evidence to support the underlying felony of robbery for his capital-murder conviction. Specifically, he argues that "the record is devoid of any evidence to support robbery" and that "[t]he only evidence offered to show [he] committed a robbery was through David Claiborne's inconsistent testimony." Jones also asserts there was no testimony to establish he was at Ellis's residence on the day she died or that any evidence demonstrated his "plan or intent to take property from Ellis."

¶28. As we have previously explained,

> [i]n reviewing the sufficiency of the evidence supporting a guilty verdict, the appellate court views the evidence in the light most favorable to the State and decides if rational jurors could have found the State proved each element of the crime. The reviewing court must accept as true all credible evidence consistent with guilt and give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Reversal may occur when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

13

*Booker v. State*, 303 So. 3d 1133, 1137-38 (¶17) (Miss. Ct. App. 2020) (citations and internal

quotation marks omitted).

¶29.    Here, the jury convicted Jones of capital murder involving a robbery. "The killing of

a human being without the authority of law by any means or in any manner shall be capital

murder . . . [w]hen done with or without any design to effect death, by any person engaged

in the commission of the crime of . . . robbery . . . ." Miss. Code Ann. § 97-3-19(2)(e) (Supp.

2017). "[U]nlike other sections of the capital[-]murder statute, subsection 2(e) does not

require the prosecution to prove the elements of murder, only that the killing took place while

the accused was 'engaged in the commission' of the enumerated felonies." *Booker*, 303 So.

3d at 1138 (¶18) (quoting *Layne v. State*, 542 So. 2d 237, 243 (Miss. 1989)). Relevant to

Jones's case, the essential elements of the underlying felony of robbery include "(1) felonious

intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means

taking and carrying away the property of another from [her] person or in [her] presence."

*Gary v. State*, 237 So. 3d 140, 147 (¶34) (Miss. 2018) (quoting *Veazy v. State*, 113 So. 3d

1226, 1229 (¶11) (Miss. 2013)).

¶30.    With regard to Jones's argument that the State presented no evidence of his plan or

intent to rob Ellis, we recognize the following:

> Mississippi follows the one-continuous-transaction rule for determining
> whether the evidence establishes the requisite nexus between the killing and
> the underlying felony to constitute capital murder. Where the two crimes e.g.,
> murder and robbery[,] are connected in a chain of events and occur as part of
> the res gestae, the crime of capital murder is sustained. Regarding the
> underlying felony of robbery, if the intervening time between the time of the
> murder and the time of taking of the property formed a continuous chain of
> events, the fact that the victim was dead when he took the property cannot

absolve the defendant from the crime of robbery. The State need not prove the defendant had the intent to rob prior to the killing. Rather, the State has the burden to prove that the two crimes are connected in a chain of events and occur as part of the res gestae.

*Batiste v. State*, 121 So. 3d 808, 831-32 (¶33) (Miss. 2013) (citations and internal quotation marks omitted).

¶31. Here, the jury heard both Claiborne's trial testimony and his recorded pretrial statement to Investigator Jefferson regarding Jones's admissions about Ellis's death and taking money from her. Investigator Jefferson testified that Claiborne knew details about Ellis's death that had not been publicly released. Claiborne stated in both his recorded pretrial statement to Investigator Jefferson and his trial testimony that Jones came to his house one evening following Ellis's murder and admitted that he (Jones) had gotten himself in trouble. Claiborne further stated that Jones admitted to choking Ellis, hitting her in the head, and taking money from her. At trial, Claiborne testified that he observed a mark on Jones's neck. In his recorded pretrial statement, Claiborne more specifically described the mark on Jones's neck as scratches. And consistent with Claiborne's statements, Investigator Jefferson testified at trial that he also personally observed scratches on Jones's hand, back, and shoulder.

¶32. On appeal, Jones asserts that Claiborne's testimony was inconsistent and was insufficient to establish that he actually robbed Ellis. Our caselaw holds, however, that "a single witness's uncorroborated testimony" can prove "sufficient to support a conviction." *Manning v. State*, 269 So. 3d 216, 221 (¶19) (Miss. Ct. App. 2018) (quoting *Cousar v. State*, 855 So. 2d 993, 998-99 (¶16) (Miss. 2003)). In addition, this Court does not make witness-

credibility determinations. *Rainey v. State*, 334 So. 3d 1124, 1132 (¶¶28-30) (Miss. 2022). Rather, the jury, in acting as the sole factfinder, "determines the weight and credibility to give witness testimony and other evidence." *Id.* at (¶30) (quoting *Manning*, 269 So. 3d at 221 (¶19)). Thus, the jury was free to consider whether any inconsistencies existed in Claiborne's testimony and to choose which portions of his testimony to accept or reject. *Id.* at (¶28).

¶33. In addition to Claiborne's testimony that Jones admitted to choking and robbing Ellis, the State presented evidence that Ellis died from strangulation rather than smoke inhalation and that Ellis's home appeared uncharacteristically messy following her death, almost as though it had been ransacked. The jury also heard testimony from Ellis's neighbor, Minor, that Jones was in the vicinity of Ellis's residence around the time of her murder and was the only person Minor saw using the nearby pathway on that day. Moreover, contrary to Jones's statement to Investigator Jefferson, his ankle monitor confirmed that he was in the vicinity of Ellis's residence both before and near the time of her death.

¶34. The State also presented DNA evidence to refute Jones's pretrial interview claims that "he had not been in [Ellis's] house in a long time" and had only "been in the yard." As previously stated, analysis performed on fingernail clippings from Ellis's left hand produced a partial DNA profile that was consistent with Jones's DNA sample. As the DNA analyst explained, the result meant that "Jones and all male individuals within his biological paternal lineage [could not] be excluded as a donor of the male DNA" retrieved from Ellis's fingernail clippings. When the DNA analyst tested clippings taken from inside Ellis's purse,

16

which was discovered under her body, the analyst stated that the results "produced a mixture [of DNA that] was consistent with the reference samples" taken from Ellis and Jones.

¶35. Viewing the evidence in the light most favorable to the State, we find there was sufficient evidence for a rational juror to conclude that the State proved each element of robbery. We further conclude in light of our applicable standard of review that the State presented sufficient evidence for a reasonable juror to convict Jones of capital murder with the underlying felony of robbery.

### III. Weight of the Evidence

¶36. Jones alternatively contends that the verdict was contrary to the overwhelming weight of the evidence. In reviewing Jones's challenge to the weight of the evidence, this Court views the evidence "in the light most favorable to the verdict." *McNair v. State*, 346 So. 3d 512, 518 (¶28) (Miss. Ct. App. 2022) (quoting *Grace v. State*, 281 So. 3d 986, 992 (¶18) (Miss. Ct. App. 2019)). We "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (quoting *Grace*, 281 So. 3d at 992 (¶18)).

¶37. In raising his weight-of-the-evidence argument, Jones reiterates his assertion that Claiborne's trial testimony was inconsistent. In addition, he questions the time gap contained in the GPS records for his ankle monitor and attacks the conclusiveness of the State's DNA evidence against him. It is well established, however, that this Court does "not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* (quoting *Thompson v.*

17

*State*, 302 So. 3d 1230, 1234 (¶11) (Miss. Ct. App. 2020)).

¶38.    The jury weighed the testimony and evidence that Jones now challenges on appeal and clearly settled questions of both weight and credibility in favor of the State. And viewing all the State's evidence in the light most favorable to the jury's verdict, we cannot say that the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* We therefore find no error.

### IV.    Ineffective Assistance of Counsel

¶39.    Finally, Jones argues that his trial attorney rendered ineffective assistance of counsel by failing to (1) reasonably investigate the GPS report for Jones's ankle monitor and (2) properly review and object to the video recording of Claiborne's pretrial statement to Investigator Jefferson. According to Jones, if his trial attorney had properly reviewed and investigated these items of evidence, the outcome of his trial would have been substantially different.

¶40.    Ineffective-assistance-of-counsel claims often are "more appropriately brought during post-conviction proceedings" rather than on direct appeal. *Nalls v. State*, 344 So. 3d 310, 317 (¶22) (Miss. Ct. App. 2022) (quoting *Stevens v. State*, 312 So. 3d 1205, 1210-11 (¶13) (Miss. Ct. App. 2021)). Nonetheless, we will address an ineffective-assistance claim on direct appeal under the following circumstances: (1) "the record affirmatively shows ineffectiveness of constitutional dimensions"; or (2) "the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id.* (quoting *Stevens*, 312 So. 3d at 1211

18

(¶13)). "[W]e [also] may address such 'claims on direct appeal when the record affirmatively shows that the claims are without merit.'" *Id.*

¶41. Here, we find the record does not affirmatively show ineffectiveness of constitutional dimensions or lack of merit. In addition, the State has not stipulated that the record is adequate for appellate review of Jones's claims on direct appeal. Because we find that we cannot appropriately address Jones's ineffective-assistance claims on direct appeal, we deny this issue without prejudice so that Jones may raise his claims in a properly filed motion for post-conviction collateral relief. *Id.* at (¶24).

## CONCLUSION

¶42. Because we find no reversible error, we affirm Jones's conviction and sentence.

¶43. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**